Merrimack
No. 7933

CITY OF CONCORD

v.

NEW TESTAMENT BAPTIST CHURCH
HERITAGE CHRISTIAN SCHOOL
ROY A. FORREST & LARRY L. THOMPSON

NEW TESTAMENT BAPTIST CHURCH
HERITAGE CHRISTIAN SCHOOL

v.

CITY OF CONCORD

January 23, 1978

*Gibbs, Craze & Thompson,* of Parma Heights, Ohio (*David C. Gibbs, Jr.,* orally), and *McSwiney, Jones & Semple,* of Concord, for the New Testament Baptist Church.

*Paul F. Cavanaugh,* city solicitor, by brief and orally for the city of Concord.

DOUGLAS, J.   The issue in this zoning case is whether a five-day-a-week school run by a fundamentalist church is a facility "usually connected with a church." We hold that it is.

In June of 1971 the Reverend Roy Forrest founded the New Testament Baptist Church in Concord, eventually locating it at 4 Union Street. In 1976 a building at 8 Union Street, separated from the church by one nonowned property, was purchased. The members of the church consider themselves "born-again Christians" and constitute one of about 3,000 congregations of Independent Baptist churches across the nation. The tenets of faith and beliefs of the members of the New Testament Baptist Church require as a convictional matter that their children receive a Bible-oriented education every day of the week, not just on Sunday morning. Accordingly in 1976 the Heritage Christian School, as part of the ministry of the church, adopted the Accelerated Christian Education curriculum and provided education in lieu of public school for grades kindergarten through twelve.

Upon the suggestion of city officials, Reverend Forrest on August 3, 1976, filed an application for a special exception with the Zoning Board of Adjustment for the city of Concord, to operate a "private school." The application indicated that the purpose of the request was that "the church is extending its teaching ministry . . . from only on Sunday to . . . during the entire week." The board heard and denied the application on August 11. A rehearing was denied, but the school opened on September 5 without city approval. State authorization as a private school had been obtained,

and State agencies had certified compliance with fire and health laws.

The congregation believed that as a matter of conviction, not just convenience, the school must open despite lack of approval from all civil authorities. *See Wisconsin v. Yoder,* 406 U.S. 205, 215-19 (1972); *Sherbert v. Verner,* 374 U.S. 398 (1963); *State v. Whisner,* 47 Ohio St. 2d 181, 199-200, 351 N.E.2d 750, 761-62 (1976). The city filed a petition to enjoin the operation of the school; the school and church filed an appeal from the board's action. Both matters were heard by a Master (*Robert A. Carignan, Esq.*) in June 1977. The master ruled against the church, and his report was approved by *Cann* J., who reserved and transferred the exceptions taken by the church. A stay pending appeal granted by this court allowed the school to remain open for its approximately fifty pupils.

■   Prior to the hearing before the master, the church amended its pleadings to allege that no special exception under the Concord zoning ordinance for a private school was in fact needed because the school was a permitted use under the ordinance allowing "facilities usually connected with a church." Despite numerous other arguments by the parties, if the ordinance allows such a facility, then the school may operate without city approval. Whether the school thus qualifies is a question of law upon which this court is "not bound by the conclusions of the zoning board" or master. RSA 31:78. *See Becker v. Town of Hampton Falls,* 117 N.H. 437, 439, 374 A.2d 653, 654-55 (1977); *Gratton v. Pellegrino,* 115 N.H. 619, 621-22, 348 A.2d 349, 351 (1975).

■   The term "connected" in the Concord ordinance should not be read to require physical propinquity but rather to prescribe close association with the primary permitted use. Webster's New International Dictionary (3d ed. 1961). That is the test in the analogous area of accessory uses. *Becker v. Town of Hampton Falls,* 117 N.H. at 440, 367 A.2d at 655. The word "usually" is more difficult to analyze. The question of what facilities are "usually" connected or associated with a church could be considered from the viewpoint of the specific church, of churches generally, or of the city. The problem with the latter view is that it involves governmental determination of propriety in religious matters and thus could infringe on the free exercise of religion guaranteed by N.H.

Const. pt. I, art. 5 and the federal first amendment. *See e.g., Wooley v. Maynard,* 430 U.S. 705, 714–15 (1977); *Wisconsin v. Yoder,* 406 U.S. 205 (1972); *Pierce v. Society of Sisters,* 268 U.S. 510 (1925). On the other hand, the church itself cannot have unfettered license.

A test for balancing the respective interests of the parties in determining a reasonable construction of the phrase at issue was developed in the area of tax exemptions for various structures of educational or religious entities. This court has said that "there is a strong presumption in favor of the judgment of an educational institution's officers as to what uses of land or buildings are necessary to promote the institution's purposes." *St. Paul's School v. Concord,* 117 N.H. 243, 250, 372 A.2d 269, 274 (1977). Furthermore, "[u]nless the determination of necessity has been made in bad faith or is unreasonable, courts are reluctant to interfere by substituting their own determination . . . ." *Id; accord, Board of Assessors v. Pioneer Valley Academy, Inc.,* 355 Mass. 610, 616, 246 N.E.2d 792, 795 (1969). Thus in the *St. Paul's* case, "free-standing houses occupied by members of the faculty" were tax exempt because their occupancy is "necessitated as being a direct and integral part of the education or learning imparted to the students, which is the primary object of the school." *St. Paul's School v. Concord,* 117 N.H. at 253, 372 A.2d at 275.

Applying this analysis to the case at hand, we first note that the parents and members of the congregation believe as a matter of religious conviction that their children should not be taught secular humanism in the public schools but receive a Christian education. As in *Yoder,* "they object to [public] education generally, because the values [it] teaches are in marked variance with [their] values and . . . way of life." *Wisconsin v. Yoder,* 406 U.S. at 210–11. This concept is not new to Roman Catholics and other faiths who desire to run their own value-oriented schools. *See Pierce v. Society of Sisters supra.*

Historically, "[i]n New England some of the schools were private, some public, and some partly public and partly private." O. Chitwood, A History of Colonial America 457 (3d ed. 1961). The school house was "generally near the church and was regarded as a sort of annex to it. Religion had a large place in the Puritan school." *Id.* Even public schools in the colonies were "closely associated with the established church." *Id.* at 458. Public compulsory educa-

tion as it is known today was a rarity in the early years of this republic. Rothbard, Historical Origins, in W. Rickenbacker, The Twelve-Year Sentence, Radical Views of Compulsory Schooling 12–16 (1974). For instance, the Quakers in Pennsylvania believed the schools to be an important extension of the church, and by the end of the eighteenth century sixty or seventy schools had been so established. O. Chitwood, *supra* at 460. Probably the oldest corporation in Pennsylvania is the present private William Penn Charter School, chartered by Penn as a Quaker school in 1689. J. Gummere, Old Penn Charter 1 (1973).

■ Thus a school may be considered as an integral and inseparable part of a church. 2 R. Anderson, American Law of Zoning 2d § 12.25, at 459–60 (1976); *see Westbury Hebrew Congregation, Inc. v. Downer*, 59 Misc. 2d 387, 302 N.Y.S.2d 923 (1969). While every church may not "usually" have a full-time school associated with it, we hold that the Heritage Christian School is a proper permitted use connected with, and is a part of, the New Testament Baptist Church.

*Exception sustained;
injunction dissolved.*

LAMPRON, J., did not sit; GOODE, J., sat by special assignment pursuant to RSA 490:3; all concurred.