[No. 47096–1.  En Banc.  February 4, 1982.]

THE CITY OF SUMNER, *Respondent,* v. THE FIRST
BAPTIST CHURCH OF SUMNER, ET AL,
*Appellants.*

*David Gibbs, Robert L. Gunter,* and *Charles E. Craze,* for appellants.

*Mann, King, Bingham, Scraggin, Manger & Pemberton* and *Gordon A. Scraggin,* for respondent.

*Fredric C. Tausend* and *David E. Engdahl,* amici curiae.

This cause, certified here by the Court of Appeals, presents a conflict between the power of the State to require conformance to zoning and building code regulations on the part of a private, church–operated school and, conversely, upon the right of members of the appellant church to freely exercise their professed religious beliefs by providing Christian education for their children.

The case was first argued to this court in October 1980, and it was reargued in November 1981. As is apparent from the extended period we have held the matter under consideration, the court has not been of one mind on the issues concerned. For reasons hereinafter discussed, we reverse and remand for additional proceedings.

The First Baptist Church has been located at its present site in a residential section of the city of Sumner for the past 75 years. For much of that time it has operated a vacation Bible school in the church building.

Adult members of the church congregation believe their children should be educated in conformance with biblical standards and philosophies. It is asserted that a tenet of their faith and belief requires this as a convictional matter. Because the instruction their children receive in the public schools cannot comport with their belief, in September 1978, the church membership established the Washington Christian Academy which purports to offer an educational program structured to conform with scriptural principles.

The academy is claimed to be an integral and inseparable part of the educational ministry of the First Baptist Church of Sumner. At oral argument here, respondent City's counsel conceded appellants' ability to prove both the claimed tenet of faith and belief and that the school was an integral part of the educational ministry of the church, if the case was remanded for the purpose of taking evidence on those issues.

This church–operated school is housed in the basement of the church building which does not meet, for use as a school, the City of Sumner's building code and zoning ordinance. The City's building inspector, who is also its fire chief, declared that the church building, particularly the basement, failed to meet the City's building code safety standards applicable to structures used for educational purposes. The building had, however, previously passed inspection for use as a church. The City sought to enjoin use of the edifice for the church–operated school.

A limited attempt by the church was made to bring the

basement into compliance with city requirements. Several safety precautions were undertaken and appellants claim a number of the purported violations noted by the City's inspector are highly technical and do not in any way endanger occupants of the building. Financial constraints, however, make unlikely any early implementation of the major structural and mechanical modifications required for full compliance with the City's demands.

The trial court found that under the city building code the academy's use of the church building constituted a "Group C Occupancy", thus subjecting the structure to the code's school safety standards. The court enjoined use of the building for *school* purposes until such time as it is brought into compliance with the code; the church obtains a special use permit for the school from the City; and off-street parking requirements are met. The building's use as a *church* was not affected. The basement multipurpose area, where the school is operated, is thus, under the court's order and the building code, available to be used for church purposes but not for school purposes even though church-purpose use on occasion may be more congested than school use.

The City did not submit specific evidence demonstrating danger to student safety, but only that the building violated the code. The fact of danger was either assumed or thought unnecessary to be established as the trial below was substantially devoted to detailing the code deficiencies. Neither the City nor the court attempted to find compromises regarding some of the noncritical building code provisions. An uncompromising position was taken that strict enforcement of all code provisions was required regardless of the technical nature of the rules or the consequences to the church's efforts to operate its school.

Appellant church appeals on three grounds: (1) uncompromising enforcement of the building code and zoning ordinance violates its religious freedoms embodied in the First Amendment and Const. art. 1, § 11; (2) the academy's use of the church building is not a "Group C Occupancy"

and thus not subject to the school safety standards; and (3) notwithstanding the two initial contentions, the school is entitled to the benefit of the "grandfather or nonconforming use" clauses contained in the City's building code and zoning ordinance.

## I

Under the circumstances presented here, a majority of the court believes this case raises a conflict between the fundamental rights of the congregation of the First Baptist Church of Sumner and the police power of the City of Sumner.

■ The congregants' right to send their children to a church–operated school is protected as a fundamental right under the United States Constitution. *Pierce v. Society of Sisters,* 268 U.S. 510, 69 L. Ed. 1070, 45 S. Ct. 571, 39 A.L.R. 468 (1925); *State v. Whisner,* 47 Ohio St. 2d 181, 351 N.E.2d 750 (1976).[1] The free exercise clause is violated by burdensome state regulation. *See generally* Bird, *Freedom From Establishment and Unneutrality in Public School Instruction and Religious School Regulation,* 2 Harv. J.L. & Pub. Pol'y 125, 188–195 (1979). The City's police power derives from the State and its inherent power to govern. *Spokane v. J–R Distribs., Inc.,* 90 Wn.2d 722, 585 P.2d 784 (1978), and cases cited therein.

■ Basically, the City here attempts an evenhanded application of a regulation concerning a valid governmental interest. It may be granted that such apparent evenhanded enforcement will not *directly* adversely impact religious beliefs or prohibit religious exercise. The *indirect* effect, however, of the government regulation in this instance will profoundly impact the church and its members. This parallels *Wisconsin v. Yoder,* 406 U.S. 205, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972) and *Thomas v. Review Bd.,* 450 U.S. 707, 67

---

[1] "[I]t has long been recognized that the right of a parent to guide the education, including the religious education, of his or her children is indeed a 'fundamental right' guaranteed by the due process clause of the Fourteenth Amendment." *State v. Whisner,* 47 Ohio St. 2d 181, 214, 351 N.E.2d 750 (1976).

L. Ed. 2d 624, 101 S. Ct. 1425 (1981), wherein it was stated:

A regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion.

*Yoder,* at 220, quoted in *Thomas,* at 717.

In *Yoder,* the State attempted to apply, in a nondiscriminatory fashion, its compulsory education law requiring all children to attend school until age 16. The Amish withdrew their children from school after they finished the eighth grade, which usually occurred when they were 14. The Amish were not adverse to education in general; rather, they believed that if their children were forced to attend public high school the youngsters could not help but be influenced by the secular world. The Court acknowledged that the State may have a "compelling interest" in the compulsory education of children. Nevertheless, it "searchingly examine[d]" the specific interest of the State in requiring Amish children to attend 2 additional years of schooling. The Court concluded that the State's interest did not outweigh the Amish interest in having their children not be exposed to worldly influences.

In *Thomas,* the Court again held that the nondiscriminatory application of a state regulation could not stand in the face of the indirect impact it had on a person's right to free exercise of religion. There, Thomas terminated his employment when his employer transferred him to a department which produced turrets for military tanks. He felt his religious beliefs forbade participation in the production of armaments. He was denied unemployment compensation benefits because he had not left his job for "good cause" as defined by Indiana law. The Supreme Court held the denial of unemployment compensation benefits constituted an indirect burden upon the free exercise of religion. It was said to have imposed a "substantial pressure on an adherent to modify his behavior and to violate his beliefs". *Thomas,* at 718. The Court noted, "[w]hile the compulsion may be indirect, the infringement upon free exercise is nonethe-

less substantial." *Thomas,* at 718.

It is argued that because the regulation here involved does not impact directly a fundamental tenet of the church, it does not violate a member's First Amendment rights. Direct impact, however, has never been a requirement. It was not against a fundamental tenet of the Amish to send their children to high school; it was the incidental effects of that requirement the Amish believed to be detrimental to their faith and hence violative of their First Amendment rights. *Wisconsin v. Yoder, supra.* It was not a fundamental tenet of the Catholic faith that unionization of teachers be disallowed; yet the Supreme Court indicated that for the National Labor Relations Board to become involved regarding parochial schoolteachers could pose a significant risk of infringement on the free exercise of religion. *NLRB v. Catholic Bishop,* 440 U.S. 490, 59 L. Ed. 2d 533, 99 S. Ct. 1313 (1979).

It was not a fundamental tenet of "born again" Christians to not allow teaching of basic education 4 hours each day; yet the pernicious though incidental effect of allowing state regulation regarding mandatory subjects and allocation of classroom time has been held to violate the free exercise clause as to that religious group. *State v. Whisner, supra.* Neither is it a fundamental tenet to employ substandard teachers in a parochial school; yet it has been held that a state cannot require nonpublic schoolteachers to have "essentially equivalent" qualifications to those in public schools. *State v. LaBarge,* 134 Vt. 276, 357 A.2d 121 (1976).

So in this case, although there is no fundamental tenet against compliance with building codes or zoning ordinances, the practical effect of their uncompromising enforcement would be to close down the church–operated school. This would deny to church members the right to guide the education of their children by sending them to their church–operated school, a fundamental and constitutionally protected right. "[A]ny *incidental* burden on the free exercise of appellant's religion may be justified [only]

by a 'compelling state interest in the regulation of a subject within the State's constitutional power . . .'" (Italics ours.) *Sherbert v. Verner,* 374 U.S. 398, 403, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963). The fundamental tenet involved need not be directly impacted for the regulation to be constitutionally infirm.

■ Where, as here, two legitimate and substantial interests collide, one may ultimately have to give way to the other. In such a situation, the court's function is to balance the interests of the parties and, if an accommodation cannot be effected, determine which interest must yield. *See Wisconsin v. Yoder, supra; Cantwell v. Connecticut,* 310 U.S. 296, 84 L. Ed. 1213, 60 S. Ct. 900, 128 A.L.R. 1352 (1940); *State v. Meacham,* 93 Wn.2d 735, 612 P.2d 795 (1980).

■ Here, the trial court did not purport to balance the interests of the parties. Nor did it determine that uncompromising enforcement of the building code and zoning ordinance constituted a governmental "interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause." *Wisconsin v. Yoder, supra* at 214. Finally, the trial court did not consider whether the means chosen to enforce the governmental interest were necessary and the least restrictive available to achieve the ends sought. *Sherbert v. Verner, supra* at 407; *Shelton v. Tucker,* 364 U.S. 479, 5 L. Ed. 2d 231, 81 S. Ct. 247 (1960).

As stated in *Yoder,* at 215:

The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.

■ As for the enforceability of governmental requirements in cases of this sort, it is recognized that a governmental entity may establish minimum safety standards under its general police power. *Board of Educ. v. Allen,* 392 U.S. 236, 245–47, 20 L. Ed. 2d 1060, 88 S. Ct. 1923 (1968). It is also generally conceded that there is a valid state

interest in applying reasonable health, fire and safety standards to private, religious schools. *State Bd. v. Rudasill*, 589 S.W.2d 877, 879 (Ky. 1979); Bird, *Freedom From Establishment and Unneutrality in Public School Instruction and Religious School Regulation,* 2 Harv. J.L. & Pub. Pol'y 125, 194 (1979).

As noted above, such regulations will be enforced against religious schools when the State proves that the specific concerns addressed by the regulations are of sufficient magnitude to outweigh the free exercise claim, that the nonapplication of the regulations will threaten the public's health or other vital interests, and that the State's interest could not otherwise be satisfied in a way which would not infringe on religious liberty. *State v. Whisner,* 47 Ohio St. 2d 181, 351 N.E.2d 750 (1976). This test ferrets out those facially neutral regulations that have an unnecessarily debilitating effect on religion.

From the record before us, it cannot be determined whether the City used the least restrictive means of achieving its compelling interest. We assume the compelling state interest in this instance is the safety of the children. The City did not develop that issue in the trial record, and the trial court did not require it to do so. The City established only that it had a building code and a zoning ordinance with which the church had not complied.

The record on appeal is, as are the trial court's findings of fact, substantially devoted to detailing code deficiencies in the church basement. That alone does not support the trial court's injunctive order. This case concerns more than the mere routine application of a building code and a zoning ordinance.

When the City, in the exercise of its police power, is confronted with rights protected by the First Amendment, it should not be uncompromising and rigid. Rather, it should approach the problem with flexibility. There should be some play in the joints of both the zoning ordinance and the building code. An effort to accommodate the religious freedom of appellants while at the same time giving effect

to the legitimate concerns of the City as expressed in its building code and zoning ordinance would seem to be in order. The record does not disclose that such an effort was made by either the City or the trial court.

The trial court should consider the practical effect uncompromising enforcement of the City's building code and zoning ordinance will have on appellants' First Amendment rights. It should "searchingly examine" the asserted interest of the City (*Wisconsin v. Yoder, supra*), and should consider the effect of allowing specific exemptions or deviations in this case. It should determine whether there are less restrictive alternatives than strict enforcement of all the technical provisions of the code while still fulfilling the legitimate governmental interest of adequately protecting the children. Further, these interests, and alternative considerations for their protection or enforcement should be articulated. In the final analysis accommodation between the competing interests must be the goal. Only if such accommodation is not possible should one legitimate interest override another.

## II

The church also argues that the trial court erred in finding that housing the school in the church basement constitutes a Group C Division 1 Occupancy under the building code, and also that the court erred in declaring that the school was not entitled to the benefit of the "grandfather or nonconforming use" clauses in the City's building code or zoning ordinance. Since these same issues could arise upon remand, we deem it appropriate to discuss them at this time.

As to the first issue, this is a factual matter. Suffice to say that if the building code is applicable here, we think there was sufficient evidence in the record from which the trial court could reasonably conclude that use of the church basement for a school met the definition of a Group C Division 1 Occupancy, as set out in Sumner's Uniform Building Code 801:

Division 1: Any building used for educational purposes through the 12th grade by 50 or more persons for more than 12 hours per week or 4 hours in any one day.

Further, if there was any error in determining that the school was a Division 1 use, it may not be prejudicial. It seems it would otherwise be a Division 2 use, the regulations for which are the same as for Division 1. Neither side should be precluded from presenting further evidence on this issue.

### III

As to the last issue, we consider first whether the church–operated school is entitled to the benefit of the "grandfather clause" of the building code and the "nonconforming use" provision of the zoning ordinance.

In 1974, the City of Sumner by ordinance 973 adopted the International Conference of Building Officials' Uniform Building Code, 1973 edition. Without question a number of the requirements of the building code, if applicable to the church building, are not presently met. Since the church building was in existence and in use as a church prior to the City's enactment of its building code, the applicability of these requirements depends upon section 104(g) of the building code, referred to herein as the "grandfather" clause. It provides that:

(g) Existing Occupancy. Buildings in existence at the time of the passage of this Code may have their existing use or occupancy continued, if such use or occupancy was legal at the time of the passage of this Code, provided such continued use is not dangerous to life.

Any change in the use or occupancy of any existing building or structure shall comply with the provisions of Sections 306 and 502.

There was no attempt to show, nor any finding, that continued use of the building as a church is dangerous to life. The City contends it is the church's burden to bring itself within the "grandfather" exemption and not the City's obligation to establish dangerousness. The church did show that the building had passed inspection for use as

a church.

The use of the building as a church before adoption of the building code was legal. Therefore, unless the use or occupancy now being made of the building represents a "change" since adoption of the building code from previous use or occupancy, the present use or occupancy may continue regardless of the failure to satisfy various building code requirements.

Section 502 of the code requires satisfaction of building code requirements notwithstanding the "grandfather" clause whenever there is a change of occupancy or use "which would place the building in a different division of the same group of occupancy or in a different group of occupancies". The code enumerates several different "groups of occupancies" (one of which is "Group C Occupancy" defined in section 801 of the code), and each "group" is subdivided into "divisions". However, there is no group or division anywhere in the building code for "churches" as such. Instead, there is a group including "assembly buildings" and buildings with "assembly rooms", with or without a "stage"; another group for buildings used for "educational purposes" (Group C); and a section (section 503) acknowledging that a single building might be used for more than one (i.e., "mixed") occupancy use.

The evidence on this issue is sketchy, but there is testimony in the report of proceedings that for many years past an educational use of the church building occurred each summer as a vacation Bible school was conducted by the church. The City in its brief asserts that a "Bible School" is different for building code purposes from "a school that met the compulsory educational requirements of the State of Washington."

This matter must be resolved by the trial court on remand. Specifically, the inquiry must be whether there is a "changed" use such that the building code applies where the church is used as a school.

As to the zoning issue, the City of Sumner Code, Title 11, is the City's zoning ordinance. The area where the church's

property is located is zoned R–1, residential. R–1 zoning would preclude church use of this property as a school, or even as a church, if an exception did not apply. One exception to the zoning ordinance pertains to continuation of nonconforming uses existing at the time the zoning ordinance was adopted. The relevant ordinance section is 11.20.020, which provides:

> Except as otherwise provided in this chapter, the lawful use of any building existing at the time of the adoption of the ordinance codified in this title, although such use does not conform to the regulations specified by this chapter for the district in which such building is located, may be continued. Any such use may be extended throughout any parts of a building which were manifestly arranged or designed for such use at the time of the adoption of the ordinance codified in this title; but no such use shall be extended to occupy any land outside such building.

There is no dispute that a "church" use of the property in question has existed continuously since before the zoning ordinance was adopted, and the continued use of the property as a "church" is permissible under section 11.20.020, even without a special use permit. However, whether the church's "school" use of the property is different from its "church" use of it, whether the "school" use antedated the zoning ordinance, and whether section 11.20.020 does not sanction this nonconforming "school" use, are issues we cannot resolve, as the record on appeal is simply too sketchy.

On remand to the trial court, the zoning ordinance issue in this case reduces to whether Washington Christian Academy *is* "church" use, inseparable in a sense sufficient to bring it within the excepted prior use. The church maintains that since the school is an integral and inseparable part of their religious faith, the use for church and school are one and the same. The City views the uses as separable. Since there was no evidence on this issue produced by either side, we decline to decide this.

The contempt citation is vacated, the injunction dis-

solved, and the case is remanded for further proceedings not inconsistent with this opinion.

The foregoing opinion was prepared by Justice Floyd V. Hicks while a member of this court. It is adopted by the undersigned as the opinion of this court.

BRACHTENBACH, C.J., and STAFFORD and DIMMICK, JJ.

UTTER, J. (concurring)—I concur with the views stated by the majority. The parameters within which government may control religion are narrow and circumscribed by U.S. Const. amend. 1 and Const. art. 1, § 11.[2] Government may, under some circumstances, intervene when religious schools fail, as they allegedly did here, to meet minimum safety standards.

For a First Amendment claim to be valid, the claimant's theological conviction must be sincere. *United States v. Seeger*, 380 U.S. 163, 185, 13 L. Ed. 2d 733, 85 S. Ct. 850 (1965). In addition, the conviction must be founded upon religious, not secular beliefs. *Wisconsin v. Yoder*, 406 U.S. 205, 216, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972). If these two conditions are met, the First Amendment guarantees freedom of belief and can grant freedom to act in accordance with those beliefs. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 84 L. Ed. 1213, 60 S. Ct. 900, 128 A.L.R. 1352 (1940).

The United States Supreme Court, however, has distinguished between the right to believe and the right to act, noting that while the right to hold a particular belief is absolute, all "[c]onduct remains subject to regulation for the protection of society." *Cantwell*, at 304. State enactments which burden the free exercise of religion will supersede First Amendment protections when the State establishes a compelling state interest for the enactment and "no alternative forms of regulation would combat such

---

[2]U.S. Const. amend. 1 provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." Const. art. 1, § 11 states that "no one shall be molested or disturbed in person or property on account of religion . . ."

abuses without infringing First Amendment rights." *Sherbert v. Verner,* 374 U.S. 398, 407, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963). As stated in *Yoder,* at 215:

> The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.

What is required is not only an absence of discrimination, protected under other constitutional guaranties, but a constitutional obligation imposed upon secular government, by the free exercise clause of the First Amendment, to "accommodate" religion. *Zorach v. Clauson,* 343 U.S. 306, 96 L. Ed. 954, 72 S. Ct. 679 (1952). As the impact upon religious exercise approaches what constitutes a practical prohibition, the burden of justification requires proof that the state interest is not only compelling, but cannot be sufficiently served in any other way. Moreover, it becomes incumbent upon the State to justify its requirements with some "particularity". *Wisconsin v. Yoder, supra* at 236.

The majority recognizes properly that minimum safety standards may be established under the general police power of this state, and that these regulations apply to private, religious schools as well as other entities. I agree with the balancing tests suggested by the majority and believe they should be applied in this case after proper fact finding has been done by the trial court.

WILLIAMS, J. (concurring)—I concur in the reasoning of the majority to the extent that I believe the courts must give some consideration to claimed religious freedoms grounded in the first amendment to the United States Constitution. I would not, however, impose the rigorous standards suggested by the majority in areas such as this which do not directly impact the right to freely practice one's religion.

I am convinced that decisions of the United States Supreme Court require us to give some deference to appellants' claims of religious freedom, but not to the extent that

such deference undermines the legitimate purpose and overriding consideration of safety. The City's concern for the welfare and safety of the children is of utmost importance. Hypertechnical or unreasonable fire or safety code regulations, however, cannot be utilized to inhibit the appellants' church–operated school activities, or to discourage the practice of their religious beliefs. The imposition of reasonable fire and safety regulations for the protection of the children is but a minimal intrusion on the religious practices of appellants.

Since the record does not indicate the trial court judge properly considered the appellants' First Amendment claims below, I agree this case should be remanded for due consideration of such issues.

DORE, J. (concurring)—I concur in the result of the majority's decision for I believe that on this record the school is entitled to the benefit of the "grandfather or nonconforming use" clauses contained in the City's building code and zoning ordinance. The basement multipurpose area was used by the church to conduct student Bible classes at the time the original permit was issued. The fact that students today are being taught subjects other than the Bible does not change the use, even though more students are being taught for more months of the calendar year.

DOLLIVER, J. (dissenting)—This is a case which deals with the location of a parochial school and the safety of children attending that school. Because the school is operated by defendants, it has been characterized by defendants and transformed by the majority into a "freedom of religion" case under the First Amendment.

There is no issue on compulsory school attendance (*Wisconsin v. Yoder*, 406 U.S. 205, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972)), or the right to send one's children to a church–operated school (*Pierce v. Society of Sisters*, 268 U.S. 510, 69 L. Ed. 1070, 45 S. Ct. 571, 39 A.L.R. 468

(1925)). Compliance by defendants with the City of Sumner building code and zoning ordinance is not claimed somehow to violate a tenet of their faith. *Compare Sherbert v. Verner,* 374 U.S. 398, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963). There is no evidence or finding that the standards applied by city officials here are different from those applied to other citizens or institutions in Sumner or is there any evidence or finding of a discriminatory application of the standards against defendants. *See* Annot., 74 A.L.R.3d 14, § 19 (1976). No assertion is made that the ordinance or code is unreasonable. *Lenci v. Seattle,* 63 Wn.2d 664, 388 P.2d 926 (1964). The zoning ordinance does not wholly exclude a church school from a residential district. *State ex rel. Wenatchee Congregation of Jehovah's Witnesses v. Wenatchee,* 50 Wn.2d 378, 312 P.2d 195 (1957).

Before discussing the issues which are in the case, it is important to review the factual situation.

In 1976, the Sumner City Council enacted zoning ordinance 1030, now Sumner City Code, Title 11. The First Baptist Church of Sumner is located in an R–1 district. In an R–1 district,

Churches, nonprofit recreational clubs, public, private and parochial schools and accessory buildings and facilities may be permitted by a special property use;

Sumner City Code 11.16.180(1). Section 11.20.020 permits the continued use of nonconforming buildings and reads:

Except as otherwise provided in this chapter, the lawful use of any building existing at the time of the adoption of the ordinance codified in this title, although such use does not conform to the regulations specified by this chapter for the district in which such building is located, may be continued. Any such use may be extended throughout any parts of a building which were manifestly arranged or designed for such use at the time of the adoption of the ordinance codified in this title; but no such use shall be extended to occupy any land outside such building.

On July 20, 1978, defendant church applied to the city planning commission for a special use permit to operate a

school. Uncontested evidence indicated defendants were establishing a school where attendance would satisfy the compulsory education requirements of the State of Washington. On September 7, 1978, a public hearing was held before the city planning commission and the application was denied. At the request of defendants, a rehearing was set for December 7, 1978. On that date a letter was delivered to the city clerk withdrawing the request for a rehearing on the special use permit. From September 1978 until the first week of June 1979, defendants operated a school in the church building.

In 1974, the city council of Sumner adopted by reference the International Conference of Building Officials' Uniform Building Code, 1973 edition. City of Sumner Code 2.02.010. the Uniform Building Code contains a "grandfather" clause, the provisions of which are as follows:

Section 104(g) provides:

> (g) Existing Occupancy. Buildings in existence at the time of the passage of this Code may have their existing use or occupancy continued, if such use or occupancy was legal at the time of the passage of this Code, provided such continued use is not dangerous to life.
>
> Any change in the use or occupancy of any existing building or structure shall comply with the provisions of Sections 306 and 502.

Section 306(b) provides:

> (b) Change in Use. Changes in the character or use of a building shall not be made except as specified in Section 502 of this Code.

Section 502 provides:

> Change in Use
> Sec. 502. No change shall be made in the character of occupancies or use of any building which would place the building in a different division of the same group of occupancy or in a different group of occupancies, unless such building is made to comply with the requirements of this Code for such division or group of occupancy.

The premises in question have been examined on several occasions by the building inspector of Sumner. The build-

ing is in violation of numerous sections of the Uniform Building Code. Defendants were advised of these violations both verbally and by letters of August 2, 1978 and September 8, 1978. On January 5, 1979, the building inspector posted notices in the building where classes were being held for the children attending the church school, the Washington Christian Academy. These notices stated the "building is deemed unsafe for human occupancy" and that it was "unlawful for any person to occupy, or reside in this building."

The position of the majority is that zoning regulations and building codes cannot be enforced against a litigant who claims a First Amendment right of religion unless the governmental agency can demonstrate: (1) a compelling governmental interest; (2) that the governmental interest outweighs appellants' First Amendment rights; (3) that the means chosen to effectuate that interest will accomplish it; and (4) that the end sought cannot be achieved by less restrictive measures. The sweep of the majority position is breathtaking and as nearly as I have been able to determine utterly without precedent. Certainly none is cited by the majority. The cases brought to the attention of the court by defendants or cited by the majority have not the slightest reference to the position taken here. *See State Bd. v. Rudasill,* 589 S.W.2d 877, 879 (Ky. 1979); Bird, *Freedom From Establishment and Unneutrality in Public School Instruction and Religious School Regulation,* 2 Harv. J.L. & Pub. Pol'y 125, 194 (1979).

A zoning law or ordinance is presumed constitutional and valid. *Duckworth v. Bonney Lk.,* 91 Wn.2d 19, 586 P.2d 860 (1978). *See* 82 Am. Jur. 2d *Zoning and Planning* § 25, at 422 (1976). Those objecting to such laws or ordinances have the burden to establish that it is unreasonable (*Lenci v. Seattle,* 63 Wn.2d 664, 388 P.2d 926 (1964)), and that the action by government officials was arbitrary, capricious or unreasonable. *State ex rel. Lyon v. Snohomish Cy. Bd. of Adj.,* 9 Wn. App. 446, 512 P.2d 1114 (1973). No authority is given nor have I been able to find any which reverses this

presumption or burden of proof simply on the claim of the First Amendment.

The evidence demonstrates and the trial court found that among the numerous inadequacies of the building for use as a school are: inadequate floor space, inadequate ventilation, no approved fire alarm system, no fire extinguishers, no fire detectors, no sprinkler system, no fire–retardant walls and ceilings, no lighted exit signs, no exit signs at all, stairs that are too narrow, doors that do not open out, and stairs of inconsistent rise and run. In addition to these violations which constitute a safety hazard, there are health code violations such as inadequate restroom facilities.

The attempt by the majority to view this case as analogous to *Wisconsin v. Yoder,* 406 U.S. 205, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972) and *Thomas v. Review Bd.,* 450 U.S. 707, 67 L. Ed. 2d 624, 101 S. Ct. 1425 (1981) is to my mind less than persuasive. In both *Yoder* and *Thomas,* the plaintiffs were left with no choice. There was no way in which the demands of the State—compulsory education to age 16 and work at a job which violated religious beliefs—could be met without a violation of a religious tenet. No such violation exists here. No bar of any kind has been raised against defendant establishing and conducting a religious school.

The majority claims "the practical effect of [the] uncompromising enforcement [of the health and safety codes] would be to close down the church–operated school." Majority opinion, at 7. That is certainly one alternative which defendant may follow if it so chooses. The other alternative is to make the required changes to come in compliance with the code, *i.e.,* for the defendant to see to it that the children attending its school have the same fire and safety protection as other school children in the state. Before the trial court defendant made neither a suggestion nor a showing this could not be done.

It may be that the correction of these deficiencies would cost a substantial sum and would be a burden on the defendants. Rather than attempting to make the appropriate changes in the building, however, or to work with the

city authorities to see if there is some "play in the joints", the defendants choose to assert financial inability, raise the banner of the First Amendment, and claim a violation of religious liberty. Children in a school need the protection of fire and safety codes. That they burn and hurt like anybody else and that they need to be protected does not suddenly become less just because a church is operating the school and the protections of the First Amendment are asserted. The great right of freedom of religion should not be mocked.

The interest at stake here is not the freedom of religion. The City has not impinged upon the religious practices of defendants nor singled them out for attack. It has made no attempt to tell defendants how they should or must follow their religious beliefs. It has not required, directly or indirectly, defendants to abandon their religious beliefs. It has not destroyed those beliefs or their constitutional exercise by defendants. It is simply asserting that most fundamental of rights: the protection of the health and safety of the oncoming generation of citizens.

As to the question of the applicability of the "grandfather" clauses, in both the zoning ordinance and the building code, the trial court found the use of the church basement by defendant church for the Washington Christian Academy to be a school. Defendants do not deny that it is a school. Furthermore, the Washington Christian Academy meets the definition of a parochial school. *See Greater N.Y. Corp. of Seventh Day Adventists v. Miller*, 54 Misc. 2d 268, 282 N.Y.S.2d 390 (1967). The claim is that the school is an integral and inseparable part of the ministry of the church to the Sumner community. *Concord v. New Testament Baptist Church Heritage Christian Sch.*, 118 N.H. 56, 382 A.2d 377 (1978). Therefore, defendants contend that the church and thus the school is exempt under the grandfather clauses of the Uniform Building Code 104(g) (1973), and the zoning ordinance section 11.20.020.

I have little doubt but that many activities in which a

church engages are part of the general work of the church. In this case, however, in contrast to *Concord v. New Testament Baptist Church Heritage Christian Sch., supra* at 58, the court need not consider the question of what activities are "connected with [the] church'". Here, under the plain language of the Sumner City Code, parochial schools are a separate category. Sumner City Code 11.16.180. There is no contention the operation of the school alone comes under the grandfather clause. Therefore, since under the Sumner ordinance a parochial school is a separate category, the fact that the activity of the church includes the school is not enough to give the school an exemption. Defendants are operating a school; that it is part of the ministry of the church is immaterial. Defendants should be required to obtain a special use permit and must meet the requirements of the building code.

The question of whether the Washington Christian Academy is a "Group C Occupancy" under the Uniform Building Code 801 (1973) need not be discussed in detail. It would not arise unless the special use permit were granted. At that time, a determination would have to be made of the applicability of the code. However, I am persuaded the analysis and findings of the trial court on this question are correct and that sufficient evidence is in the record to support the findings.

I would affirm the trial court and, thus, I dissent.

ROSELLINI, J. (concurring in the dissent)—As I read the Sumner City Code, it is a combination of building and fire regulations. The inspection revealed many violations of its fire safety provisions. Each violation created a fire hazard. The building was not constructed with the required fire retardant material, and the exits from the building were inadequate to evacuate occupants in time to save lives.

In my own research, I find the majority and counsel for both plaintiff and defendant have failed to find any case

holding that enforcement of a fire code violates the religious freedoms embodied in the first amendment to the United States Constitution or Const. art. 1, § 11.