Board of Education
No. 81-075

APPEAL OF DENISE PEIRCE AND CHRISTOPHER RICE
(New Hampshire Board of Education)

September 2, 1982

*New Hampshire Civil Liberties Union (Robert M. Larsen* on the brief and orally), for the plaintiffs.

*Buckley & Zopf*, of Claremont (*Robert B. Buckley, Jr.*, on the brief and orally), for the Claremont School District.

Bois, J. The plaintiffs appeal from a decision of the State Board of Education (State board) denying their application to provide home education for six-year-old Justin Peirce. They claim that the State board made erroneous evidentiary findings and failed to enforce certain due process procedures. We affirm in part, reverse in part, and remand.

On May 1, 1980, the plaintiffs, Denise Peirce and Christopher Rice, filed an application, pursuant to RSA 193:3, with the Claremont School Board, seeking permission to provide home education for Denise's son, Justin. The plaintiffs subsequently revised the application on two occasions. After a hearing on July 29,

1980, however, the Claremont School Board (the local board) voted to deny the plaintiffs' request.

In June 1980, the State Board of Education adopted "Regulations and Procedures Pertaining to Home Education Programs in New Hampshire." The regulations, which were promulgated on a trial basis, became effective on July 2, 1980, and recently expired on July 2, 1982. They established several prerequisites to the granting of a home-education program, including a requirement that the applicant prove the existence of a "manifest educational hardship." *See* Regulations pt. I, § 2 (1980). In addition, the regulations contained a section, entitled "Due Process Procedures," which stated that upon the denial of a home-education application, the local school authority had to provide a written description of any deficiencies in the application as well as written recommendations for correcting these deficiencies. *See id.* pt. III, § 2.

Because the plaintiffs had filed their application prior to the adoption of the State regulations, the Claremont School Board did not fully comply with the regulations while processing the May 1, 1980, application. As a result, the local board permitted the plaintiffs, on October 3, 1980, to submit a supplemental application which was to be evaluated in light of the newly adopted regulations. Following a hearing on the supplemental application, the local board found that the plaintiffs had not proven the existence of a "manifest educational hardship" as defined under the State regulations. The local board therefore denied the plaintiffs' supplemental application.

In December 1980, the plaintiffs filed a timely appeal with the State Board of Education under RSA 193:3. Shortly thereafter, the State board conducted a hearing and determined that the plaintiffs had failed to demonstrate a "manifest educational hardship." The State board also ruled that the local board had sufficiently complied with the due process procedures of the State regulations. The State board affirmed the decision of the Claremont School Board and denied the plaintiffs' request for reconsideration. The plaintiffs then initiated this appeal. *See* RSA 541:6.

The plaintiffs argue that the State board erred when it found that they had not demonstrated a "manifest educational hardship" within the meaning of the home-education regulations.

Because the plaintiffs' argument revolves around the alleged existence of a "manifest educational hardship," we must examine the meaning of this term under the applicable regulations. Part II, section 2.2 of the regulations stated that a "manifest educational hardship" would be considered to exist upon an objective showing that the applicant's child would derive "special benefits" from a

*"quality home education program."* Part II, section 2.2 also set forth nine factors which were designated as "quality indicators." These indicators included criteria such as the competency of the parents, the scope of the subject matter to be studied at home, the child's potential for interaction with peers and adults, and the teaching methods to be employed.

The introduction to part II, section 2 of the regulations stated that a "manifest educational hardship *may* be considered to exist when one or more [quality] indicators are present." (Emphasis added.) The plaintiffs argue that this section required the State board to find a "manifest educational hardship" upon proof of any one of the nine indicators.

We disagree with the plaintiffs' interpretation. We hold that the use of the word "may" in the introduction to part II, section 2 was intended to make the finding of a "manifest educational hardship" permissive, rather than mandatory. *See Town of Nottingham v. Harvey*, 120 N.H. 889, 895, 424 A.2d 1125, 1129 (1980). *See generally* 2A C. SANDS, SUTHERLAND STATUTORY CONSTRUCTION § 57.03, at 415–16 (4th ed. 1973). The language in part II, section 2.2, moreover, supports our construction. This section stated that the quality indicators were merely factors which "[might] be considered" in determining whether a child would derive special benefits from a home-education program. As a result, we conclude, contrary to the plaintiffs' argument, that the regulations provided the State board with a certain degree of discretion in determining whether special benefits or a "manifest educational hardship" existed. Furthermore, we interpret the phrase *"special* benefits" (emphasis added) according to its common usage, *see* RSA 21:2, to mean benefits which are distinct or noteworthy.

Having examined the general requirements for a "manifest educational hardship" under part II, section 2.2 of the regulations, we turn briefly to the applicable standard of review on this appeal. We must uphold an agency's decision, in the absence of an erroneous ruling of law, unless we find by a preponderance of the evidence that the decision was unjust or unreasonable. RSA 541:13; *see Appeal of Society for the Protection of Environ. of S.E. N.H.*, 122 N.H. 703, 706–07, 449 A.2d 1205, 1207 (1982); *Appeal of Town of Goffstown*, 121 N.H. 999, 1001, 437 A.2d 291, 293 (1981); *Appeal of Gas Service, Inc.*, 121 N.H. 797, 799, 435 A.2d 126, 128 (1981). In reviewing an administrative decision, we will treat the agency's findings of fact as prima facie lawful and reasonable. RSA 541:13; *see Appeal of Gas Service, Inc.*, 121 N.H. at 799, 435 A.2d at 128. We will not substitute our judgment for that of the agency. *Appeal of*

*Concord Natural Gas Corp.*, 121 N.H. 685, 692, 433 A.2d 1291, 1296 (1981).

■ In this case, we find that the evidence raised legitimate questions which might reasonably have led the State board, in its discretion under the regulations, to rule that the plaintiffs' proposed home-education program would not have provided Justin with *special* benefits, the prerequisite to a "manifest educational hardship" under part II, section 2.2. The record reveals that neither Denise Peirce nor Christopher Rice had a college degree or any other special expertise. The record also indicates that the proposed home-education curriculum involved limited and irregular hours of organized instruction. For example, Christopher Rice testified that he intended to instruct Justin for two hours in the morning and for an unidentified period at night but that these hours would be readjusted if Justin preferred to play during the scheduled times. Rice further stated that Justin would be free to play between the hours of noon and 6 p.m., and that on some occasions Justin would be permitted to play all day long. Based on this evidence, we cannot say that the State board's finding, that the plaintiffs had failed to demonstrate special benefits or a "manifest educational hardship," was unreasonable or unjust.

■■ The plaintiffs also argue that the State board erred when it ruled that the Claremont School Board had sufficiently complied with the "Due Process Procedures" of the regulations. As previously mentioned, the regulations, pt. III, § 2, required local school authorities to provide all unsuccessful home-education applicants with written recommendations for rectifying any deficiencies in their applications. The record before us, however, reveals that the Claremont School Board never provided the plaintiffs with written recommendations for correcting the deficiencies in their application. It is well settled that administrative boards must enforce their own rules and regulations. *Appeal of the City of Nashua*, 121 N.H. 874, 876, 435 A.2d 1126, 1127–28 (1981). The State board therefore should have required the local board to provide the plaintiffs with the requisite recommendations. For this reason, we reverse the State board's ruling concerning the local board's compliance with the "Due Process Procedures" of the regulations, and we remand for enforcement of the recommendation procedures.

Following the issuance of written recommendations by the Claremont School Board, the plaintiffs should be given an opportunity to correct the deficiencies and to resubmit their application for approval by the local board. If the local board denies the revised application, the plaintiffs may again appeal to the State

board. The appeal to the State board would be governed by the regulations discussed in this opinion notwithstanding the expiration of these regulations on July 2, 1982.

In closing, we emphasize that the local board must provide the plaintiffs with clear and constructive written recommendations. Nevertheless, without intending any reference to the instant dispute, we recognize that in some cases the deficiencies in an application may be of such magnitude that there is little or no chance of correcting them. In these cases, the local boards would satisfy their obligations under the regulations by identifying the specific deficiencies and explaining why they consider the deficiencies irreparable.

*Affirmed in part; reversed in part; remanded.*

DOUGLAS and BROCK, JJ., concurred specially; the others concurred.

DOUGLAS and BROCK, JJ., concurring specially: We concur in the court's holding that due process was denied these plaintiffs but cannot agree with the overly restrictive approach to RSA 193:3 by the majority.

First, some background. Historically the idea of compulsory schooling was conceived in the Protestant Reformation by Martin Luther and fostered throughout Europe as a device to suppress dissent and compel adherence to the dominant religious forces. W. RICKENBACKER, THE TWELVE-YEAR SENTENCE 11–13 (1974). In contrast, the more individualistic and freedom-loving American colonists utilized private and voluntary education as the norm. *See id.* at 13; *City of Concord v. New Testament Baptist Church*, 118 N.H. 56, 59–60, 382 A.2d 377, 379–80 (1978). While the first compulsory literacy law was enacted by the Colony of Massachusetts Bay's Puritans in 1642, it was not until 1789 that the Commonwealth of Massachusetts established the first comprehensive, statewide system of compulsory schooling. W. RICKENBACKER, *supra*, at 14. Such nineteenth century professional educationists as Horace Mann and Calvin Stowe set about to require universal American public education backed up by governmental compulsion through use of truancy laws. *Id.; see also* N. EDWARDS, THE COURTS AND THE PUBLIC SCHOOL 519 (1971). Indeed, one proponent of such concepts, Newton Bateman, who was heavily influenced by Prussian thought, even wrote that because the government's "right of eminent domain" extends over the "minds of souls and bodies" of individuals,

education cannot be entrusted to "the caprices and contingencies" of individual parents. W. RICKENBACKER, *supra*, at 23.

The ultimate step in the process of standardizing all American education occurred in Oregon in 1922 when *all* private schools were banned and children were compelled to attend public schools. The implicit intent of this action was to promote uniformity by forbidding ethnic and religious groups to educate their children in a manner they desired. In *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), however, the United States Supreme Court stated that "the child is not the mere creature of the State" and concluded that Oregon had interfered with the "liberty of parents and guardians to direct the upbringing and education of children under their control. . . ." *Id.* at 534–35. The Court held that such interference violated the due process clause of the fourteenth amendment.

Similar protection of the parents' substantive due process right to control the upbringing of their children was recognized in *Meyer v. Nebraska*, 262 U.S. 390 (1923), in which the court invalidated a State statute that prohibited teaching of modern foreign languages.

More recently in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), the Court concluded that a State could not compel Amish children to attend high school in violation of their religious beliefs. Although *Yoder* was a first amendment decision, language in the opinion, reminiscent of that in *Pierce* and *Meyer*, suggests that parents may have a fundamental right to control the education of their children:

> "The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition. . . ."

*Id.* at 232. This court specifically cited this quotation in reaffirming the fundamental rights of parents to the custody, care and nurture of their children. *State v. Robert H.* _____, 118 N.H. 713, 715, 393 A.2d 1387, 1388 (1978). Indeed, at common law the parents' authority over the education of their children was unquestionably a natural right which arose out of those parental responsibilities. *See* 1 W. BLACKSTONE, COMMENTARIES, 450–53 (1809); *People v. Stanley*, 81 Colo. 276, 280–81, 255 P. 610, 613 (1927); N. EDWARDS, *supra*, at 519. Thus, while the State may adopt a policy requiring that children be educated, it does not have the unlimited power to require they be educated in a certain way at a certain place. N. EDWARDS, *supra*, at 521.

Home education is an enduring American tradition and right having produced such notables as Abraham Lincoln, *see* A. BEVERIDGE, ABRAHAM LINCOLN 63 (1928) (one year of schooling); Woodrow Wilson, *see* R. BAKER, WOODROW WILSON: LIFE AND LETTERS, 37 (1927) (little formal schooling prior to college); and Thomas Edison, *see* M. JOSEPHSON, EDISON at 20–23 (1959) (basically taught at home by his mother). Currently, it is estimated that 10,000 children nationwide are being taught at home. Morton, *The Home-Education Controversy*, BOSTON MAGAZINE, October 1979, at 213; *Teaching Kids at Home*, 81 CURRENT EVENTS, March 1, 1982, at 4.

Recently, our neighboring State of Vermont held that requiring a child to attend public school or else be receiving an "equivalent education" could not be read to require that attendance be exclusively confined to "approved schools." Said the Vermont court:

> "[T]he state would be hard put to constitutionally justify limiting the right of normal, unhandicapped youngsters to attendance at 'approved' institutions."

*State v. LaBarge*, 134 Vt. 276, 280, 357 A.2d 121, 124 (1976). Thus, approval requirements for non-public school education may not unnecessarily interfere with traditional parental rights. Bristow, *Private Schools in Vermont: The "Equivalency Exception" to Compulsory Public School Attendance—State v. LaBarge*, 2 VT. L.R. 205, 211 (1977). It is with this discussion and background in mind that the school board must consider the parents' request and apply the State regulations of the 1982–83 school year.