[No. 49673-1. En Banc. October 4, 1984.]

LARRY WITTERS, *Appellant,* v. THE COMMISSION
FOR THE BLIND, *Respondent.*

*Michael P. Farris* of *Bill of Rights Legal Foundation,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *David R. Minikel, Assistant,* for respondent.

PEARSON, J.—This appeal involves the denial by the Washington State Commission for the Blind[1] of financial vocational assistance to a person studying in preparation for a career as a pastor, missionary, or youth director. The Commission denied appellant Larry Witters' request for financial assistance on March 11, 1980, based on an interpretation of the "religion clauses" of the Washington State Constitution, article 1, section 11, and article 9, section 4.

We affirm the decision of the Commission. We hold the provision of state aid to a person studying to be a pastor, missionary, or church youth director violates the establishment clause of the first amendment to the United States Constitution. Since our state constitution requires a far stricter separation of church and state than the federal constitution (*see Weiss v. Bruno,* 82 Wn.2d 199, 509 P.2d 973 (1973)), it is unnecessary to address the constitutionality of the aid under our state constitution.

Appellant Witters meets the medical and physical eligibility requirements for status as a legally blind person, qualifying him to receive vocational assistance pursuant to RCW 74.16. (Repealed, Laws of 1983, ch. 194, § 30, p. 1057.)

Appellant initially requested financial assistance while pursuing a 3–year Bible diploma course of study at the Inland Empire School of The Bible in Spokane, Washington. He later changed to a 4–year program which would result in a biblical studies degree from Inland Empire School of The Bible, and a bachelor of arts degree from Whitworth College.

---

[1]The Washington State Commission for the Blind has been renamed the Department of Services for the Blind, effective June 30, 1983. Laws of 1983, ch. 194, § 3, p. 1050.

Appellant sought an administrative review of the Commission's decision, which resulted in a reaffirmation of the initial denial of assistance. An appeal was taken to the Spokane County Superior Court pursuant to the provisions of RCW 74.16.530(1) and the administrative procedure act, RCW 34.04. After the submission of briefs and oral argument, the trial court upheld the Commission's decision to deny financial assistance based upon an interpretation of the Washington Constitution. The trial court's findings of fact and conclusions of law and an order affirming the Commission's decision were entered on May 26, 1982. Appellant appealed that decision to Division Three of the Court of Appeals, which then certified the case to this court pursuant to RCW 2.06.030(2)(d).

I

Appellant seeks financial assistance for his education pursuant to RCW 74.16.181. The relevant portions of this provision read as follows:

The commission may maintain or cause to be maintained a program of services to assist visually handicapped persons to overcome vocational handicaps and to obtain the maximum degree of self–support and self–care. Services provided for under this section may be furnished to clients from other agencies of this or other states for a fee which shall not be less than the actual costs of such services. Under such program the commission may:

. . .

(3) Provide for special education and/or training in the professions, business or trades under a vocational rehabilitation plan, and if the same cannot be obtained within the state, provisions shall be made for such purposes outside of the state. Living maintenance during the period of such education and/or training within or without the state may be furnished.

The Supreme Court has developed a 3–part test for determining the constitutionality of state aid under the establishment clause of the First Amendment.

First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . .; finally, the statute must not foster "an excessive government entanglement with religion."

*Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 29 L. Ed. 2d 745, 91 S. Ct. 2105 (1971). To withstand attack under the establishment clause, the challenged state action must satisfy each of the three criteria.

### A. PURPOSE

■ Applying the first factor of the *Lemon* test to the present statute is quite easy. As stated in part in the statute itself:

The commission [for the blind] may maintain or cause to be maintained a program of services to assist visually handicapped persons to overcome vocational handicaps and to obtain the maximum degree of self–support and self–care.

RCW 74.16.181. The secular purpose requirement has become a largely perfunctory inquiry easily satisfied by any legislative recitation of purpose. As the Supreme Court recently stated in *Mueller v. Allen,* ___ U.S. ___, 77 L. Ed. 2d 721, 103 S. Ct. 3062 (1983):

[G]overnmental assistance programs have consistently survived this [secular purpose] inquiry . . . This reflects, at least in part, our reluctance to attribute unconstitutional motives to the states, particularly when a plausible secular purpose for the state's program may be discerned from the face of the statute.

(Citations omitted.) *Mueller,* 77 L. Ed. 2d at 728. The State clearly has an interest in assisting the visually handicapped. We need only look to the above quoted statement of purpose found in RCW 74.16.181 to hold that this statute has a valid secular legislative purpose.

### B. EFFECT

■ The second part of the *Lemon* test, that the primary effect of the state aid must neither advance nor inhibit religion, requires that we "narrow our focus from the stat-

ute as a whole to the only transaction presently before us."
*Hunt v. McNair,* 413 U.S. 734, 742, 37 L. Ed. 2d 923, 93 S.
Ct. 2868 (1973). Rather than look to the face of the reha-
bilitation statute, which is neutral in that benefits are pro-
vided to the student irrespective of the type of school
attended or the degree sought, we focus our attention on
the particular aid sought by the appellant.

█ In *Hunt,* the Court offered guidance for making this
"primary effect" determination.

> Aid normally may be thought to have a primary effect
> of advancing religion when it flows to an institution in
> which religion is so pervasive that a substantial portion
> of its functions are subsumed in the religious mission *or
> when it funds a specifically religious activity in an
> otherwise substantially secular setting.*

(Italics ours.) *Hunt,* at 743. Additional guidance is found in
*Roemer v. Board of Pub. Works,* 426 U.S. 736, 49 L. Ed. 2d
179, 96 S. Ct. 2337 (1976) (plurality opinion).

> The Court has taken the view that a secular purpose and
> a facial neutrality may not be enough, if in fact the State
> is lending direct support to a religious activity. The State
> may not, for example, pay for what is actually a religious
> education, even though it purports to be paying for a
> secular one, and even though it makes its aid available to
> secular and religious institutions alike.

*Roemer,* at 747.

The provision of financial assistance by the State to
enable someone to become a pastor, missionary, or church
youth director clearly has the primary effect of advancing
religion. Appellant is not pursuing a secular course of study
with the personal objective of becoming a minister. The
curriculum for his course of pastoral study includes classes
in old and new testament studies and church administra-
tion. It is not the role of the State to pay for the religious
education of future ministers. We hold that the principal or
primary effect of the aid sought by appellant would be to
advance religion, and would thus violate the establishment
clause of the First Amendment.

## C. ENTANGLEMENT

The third criterion of the *Lemon* test is that the aid must not foster an excessive government entanglement with religion. In *Lemon v. Kurtzman,* 403 U.S. 602, 29 L. Ed. 2d 745, 91 S. Ct. 2105 (1971), the Supreme Court set forth a 3–pronged inquiry to determine the existence of excessive entanglement. The relevant factors are: (1) the character and purposes of the institutions that are benefited, (2) the nature of the aid that the State provides, and (3) the resulting relationship between the government and the religious authority. *Lemon,* at 615. Typically this inquiry involves a state legislative attempt to provide aid to all of the state's private schools. For example, *Lemon* involved both Rhode Island and Pennsylvania statutes which provided extensive state aid to private schools. The Rhode Island statute provided salary supplements for teachers of secular subjects in private schools. The Pennsylvania program involved the reimbursement of private schools for teachers' salaries, textbooks, and instructional materials. The case before us is much different. This case involves one person's effort to get financial assistance for his theological training. The 3–pronged "entanglement" inquiry is ill suited to this case. In addition, the administrative and trial court records do not provide an adequate factual basis to make the type of inquiry contemplated by the Supreme Court.

Since we have held that the aid sought by the appellant would violate the establishment clause because it would have the primary effect of advancing religion, it is unnecessary for us to attempt a strained analysis of the "entanglement" factor of the *Lemon* test.

## II

Appellant makes two additional arguments: first, that the Commission's denial of aid violates the free exercise clause of the First Amendment; and second, that the Commission's action violates the equal protection clause of the Fourteenth Amendment.

## A. Free Exercise

■ For a violation of the free exercise clause, one must show "the coercive effect of the enactment as it operates against him in the practice of his religion." *School Dist. v. Schempp,* 374 U.S. 203, 223, 10 L. Ed. 2d 844, 83 S. Ct. 1560 (1963). The challenged state action must somehow compel or pressure the individual to violate a tenet of his religious belief. In *Thomas v. Review Bd.,* 450 U.S. 707, 67 L. Ed. 2d 624, 101 S. Ct. 1425 (1981), the Court noted:

Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.

*Thomas,* at 717–18. *Thomas* involved the State of Indiana's denial of unemployment compensation benefits to a Jehovah's Witness who terminated his employment with a company which fabricated steel when he was transferred from the roll foundry to a department that produced turrets for military tanks. He claimed his religious beliefs prevented him from participating in the production of war materials. The Court held the denial of unemployment benefits was a violation of the free exercise clause since it forced him to choose between "fidelity to religious belief or cessation of work . . ." *Thomas,* at 717.

In the present case, the Commission's denial of vocational aid to the appellant did not compel or pressure him to violate his religious beliefs. Appellant chose to become a minister, and the Commission's only action was to refuse to pay for his theological education. The Commission's decision may make it financially difficult, or even impossible, for appellant to become a minister, but this is beyond the scope of the free exercise clause. We hold that the Commission's refusal to provide financial assistance did not violate the free exercise clause of the federal constitution.

## B. Equal Protection

Appellant's final argument, that the Commission's action

violates the equal protection clause of the Fourteenth Amendment, is quite novel. This argument was premised on the ground that the aid sought was allowable under the federal constitution, but was denied by the Commission solely because it would violate the religion clauses of the state constitution. Const. art. 1, § 11 and Const. art. 9, § 4. We have held that to provide the aid sought by the appellant would violate the establishment clause. This precludes any need to determine whether the denial of aid on state constitutional grounds would violate the equal protection clause of the Fourteenth Amendment.

We affirm the decision of the Commission to deny appellant's request for financial assistance.

WILLIAMS, C.J., ROSELLINI, BRACHTENBACH, DORE, and DIMMICK, JJ., and CUNNINGHAM, J. Pro Tem., concur.

ROSELLINI, J. (concurring)—I agree with the majority. The separation of church and state, mandated by Const. art. 1, § 11 and Const. art. 9, § 4, would be violated by financing appellant's vocational instruction as a minister.

The dissent asserts, however, that the majority's decision is rendered "without sufficient facts or justification." This contention is without merit. We need look no farther than the plain language of our constitutional provisions, which state, in part:

> *No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment: . . .*

(Italics mine.) Const. art. 1, § 11.

> § 4 Sectarian control or influence prohibited. All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence.

Const. art. 9, § 4.

Moreover, our interpretation of these provisions has consistently rejected any inroads on the absolute prohibition contemplated by our forefathers. Thus, in *Weiss v. Bruno,*

82 Wn.2d 199, 206, 509 P.2d 973 (1973), we observed:

> In deciding these questions we recognize that the proscription of article 9, section 4 is far stricter than the more generalized prohibition of the first amendment to the United States Constitution. While the establishment clause broadly condemns any law "respecting an establishment of religion," our constitution specifically demands that no public funds be used to maintain or support any school which is under sectarian control or influence. There is no such thing as a "de minimis" violation of article 9, section 4. Nor is a violation of this provision determined by means of a balancing process. The words of article 9, section 4 mean precisely what they say; the prohibition is absolute.
>
> It is indisputable that this more restrictive clause was the deliberate design of the framers of our constitution.

(Footnote omitted.)

To finance appellant's career goal of becoming a minister would violate this absolute prohibition. This we cannot do.

UTTER, J. (dissenting)—The majority holds that under the establishment clause of the United States Constitution, the State must single out handicapped college students who wish to pursue religious careers and deny them vocational rehabilitation assistance that is otherwise available to all handicapped college students in Washington. The majority also concludes that denying aid under a general educational program only to those who wish to pursue religious careers does not violate the free exercise clause of the First Amendment. Finally, the majority concludes that the federal constitutional issues should be decided before and to the exclusion of the state constitutional issues that form the primary basis for this appeal. I dissent from all these decisions.

I

I agree with the majority that in order to withstand attack under the First Amendment's establishment clause, the granting of educational assistance sought by appellant must satisfy all three parts of the *Lemon* test, which

requires:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . .; finally, the statute must not foster "an excessive government entanglement with religion."

*Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 29 L. Ed. 2d 745, 91 S. Ct. 2105 (1971). I also agree with the majority's conclusions that the vocational rehabilitation statute has a secular legislative purpose, that the "entanglement" inquiry is ill suited to this type of situation, and that the record does not provide us with sufficient information to find that an unconstitutional level of "entanglement" would result from allowing religious students to take advantage of the same vocational education benefits that are made available to all other handicapped Washingtonians. However, I disagree with the majority's conclusion that granting vocational rehabilitation assistance to all otherwise eligible students would have a "principal or primary effect" of advancing religion in violation of the First Amendment.

The majority relies on two cases for guidance in determining whether the aid sought here would have the primary effect of advancing religion. In *Hunt v. McNair,* 413 U.S. 734, 37 L. Ed. 2d 923, 93 S. Ct. 2868 (1973), the United States Supreme Court upheld a statute that authorized the issuance of revenue bonds for construction of facilities at the Baptist College of Charleston. The Court began its analysis of the primary "purpose" of the scheme by noting that "[w]hatever may be its initial appeal, the proposition that the Establishment Clause prohibits any program which in some manner aids an institution with a religious affiliation has consistently been rejected." *Hunt,* at 742. The Court went on to hold that the primary effect of the scheme was not to advance religion, because the record did not contain sufficient evidence of the "pervasively sectarian" nature of the Baptist College,[2] or that the

---

[2] The Baptist College of Charleston was run by a Board of Trustees elected by

State had helped to fund the religious (as opposed to secular) activities of the College. The record in *Hunt* appears to have been much more detailed and specific about the answers to these questions than the record in this case.

In *Roemer v. Board of Pub. Works,* 426 U.S. 736, 49 L. Ed. 2d 179, 96 S. Ct. 2337 (1976), Maryland gave grants to a number of religious and nonreligious colleges, with a statutory requirement that the funds not be used for sectarian purposes. A 3–judge plurality upheld the statute after applying the *Lemon* test, and finding it unnecessary under the circumstances to elaborate on what constitutes a "specifically religious activity" that would have the "primary effect" of advancing religion. *Roemer,* at 760–61. In reaching its decision, however, the plurality observed that a "hermatic separation" between church and state is impossible and has never been required, *Roemer,* at 746, and that

> religious institutions need not be quarantined from public benefits that are neutrally available to all. The Court has permitted the State to supply transportation for children to and from church–related as well as public schools. *Everson* v. *Board of Education,* 330 U. S. 1 (1947). It has done the same with respect to secular textbooks loaned by the State on equal terms to students attending both public and church–related elementary schools. *Board of Education* v. *Allen,* 392 U. S. 236 (1968). Since it had not been shown in *Allen* that the secular textbooks would be put to other than secular purposes, the Court concluded that, as in *Everson,* the State was merely "extending the benefits of state laws to all citizens." *Id.,* at 242. Just as *Bradfield [v. Roberts,* 175 U.S. 291 (1899)] dispels any notion that a religious person can never be in the State's pay for a secular purpose, *Everson* and *Allen* put to rest any argument that the State may never act in such a way that has the incidental effect of facilitating religious activity.

*Roemer,* at 746–47.

As the discussion above illustrates, neither of the cases

---

the South Carolina Baptist Convention, which also retained the sole authority to amend the College's charter and to approve certain financial transactions. *Hunt,* at 743.

relied on by the majority is directly on point, and each provides only vague, general guidance in deciding the case at bar. A better approach may be gleaned from a line of cases that includes *Roemer* but actually begins with *Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 37 L. Ed. 2d 948, 93 S. Ct. 2955 (1973). In *Nyquist,* the Court struck down a complex set of state programs to aid nonpublic elementary and secondary schools, including a tuition grant program that reimbursed low-income parents for part of the cost of their children's tuition at nonpublic schools. The Court distinguished the invalid tuition grants in *Nyquist* from the constitutional aid programs upheld in *Board of Educ. v. Allen,* 392 U.S. 236, 20 L. Ed. 2d 1060, 88 S. Ct. 1923 (1968) and *Everson v. Board of Educ.,* 330 U.S. 1, 91 L. Ed. 711, 67 S. Ct. 504, 168 A.L.R. 1392 (1947), as follows:

> *Allen* and *Everson* differ from the present litigation in a second important respect. In both cases the class of beneficiaries included *all* schoolchildren, those in public as well as those in private schools. See also *Tilton* v. *Richardson,* [403 U.S. 672 (1970)], in which federal aid was made available to *all* institutions of higher learning, and *Walz* v. *Tax Comm'n,* [397 U.S. 664 (1970)], in which tax exemptions were accorded to *all* educational and charitable nonprofit institutions. . . .
>
> Because of the manner in which we have resolved the tuition grant issue, we need not decide whether the significantly religious character of the statute's beneficiaries might differentiate the present cases from a case involving some form of public assistance (*e. g.,* scholarships) made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited. See *Wolman* v. *Essex,* 342 F. Supp. 399, 412–413 (SD Ohio), aff'd, 409 U. S. 808 (1972). Thus, our decision today does not compel, as appellees have contended, the conclusion that the educational assistance provisions of the "G. I. Bill," 38 U. S. C. § 1651, impermissibly advance religion in violation of the Establishment Clause.

*Nyquist,* at 782 n.38. The Court also reiterated its earlier observation that there are significant differences between

the religious aspects of church–related colleges and paro-
chial elementary and secondary schools, since the former
are far less likely to make religious indoctrination a major
part of their programs, and are far less likely to be success-
ful at indoctrinating college students even if they tried to
do so. *See Tilton v. Richardson,* 403 U.S. 672, 685–86, 29 L.
Ed. 2d 790, 91 S. Ct. 2091, *reh'g denied,* 404 U.S. 874
(1971); *Hunt v. McNair, supra* at 746; *Nyquist, supra* at
777 n.32; *see also Americans United for Separation of
Church & State Fund, Inc. v. State,* 648 P.2d 1072, 1079
(Colo. 1982); *Americans United v. Rogers,* 538 S.W.2d 711,
717, 722 (Mo.), *cert. denied,* 429 U.S. 1029 (1976).

In *Wolman v. Essex,* 342 F. Supp. 399 (S.D. Ohio), *aff'd,*
409 U.S. 808 (1972), cited with approval in *Nyquist,* the
District Court permanently enjoined a state program pro-
viding, among other things, tuition reimbursement grants
to parents of children attending nonpublic elementary and
secondary schools, 95 percent of whom attended Catholic
parochial schools. In determining the primary effect of the
program, the court looked to "the class to which [the pro-
gram] is directed and that will be affected by it." *Wolman,*
at 412. This approach led the court to distinguish the
invalid program from the valid programs in *Everson, Walz
v. Tax Comm'n,* 397 U.S. 664, 25 L. Ed. 2d 697, 90 S. Ct.
1409 (1970), and *Tilton* on the grounds that the valid pro-
grams were directed to a broad class that was not predomi-
nately composed of persons attending religious schools, and
analogized such cases to situations in which the state pro-
vides police and fire protection to all regardless of religious
affiliation. *Wolman,* at 412–13. The court also dismissed
one of the proponent's arguments by stating:

> Defendants attempt to analogize the statute at bar to
> statutes which provide economic aid to R.O.T.C. students
> or student–veterans, regardless of the school at which
> they attend. This analogy must fail, for if religious
> schools indirectly derive benefit from such programs, this
> benefit is entirely incidental and subordinate to the
> legitimate secular purposes underlying their enactment—

purposes which have nothing whatever to do with religion.

*Wolman,* at 412 n.17.

Finally, the United States Supreme Court's most recent pronouncement on this issue is found in *Mueller v. Allen,* ___ U.S. ___, 77 L. Ed. 2d 721, 103 S. Ct. 3062 (1983). In that case, the Court upheld a statute giving the parents of public and private school students alike state income tax deductions for tuition, textbooks and transportation expenses related to their children's primary and secondary education. The program was found constitutional in spite of the fact that about 95 percent of students attending private schools in the state attended sectarian schools, *Mueller,* at 3065, 3070, and that public school children had no tuition payments to deduct. *See Mueller,* at 3070. The Court considered several factors in determining that the scheme did not have a primary effect of advancing religion, two of which are applicable to the case at bar:

> Most importantly, the deduction is available for educational expenses incurred by *all* parents, including those whose children attend public schools and those whose children attend non–sectarian private schools or sectarian private schools. Just as in *Widmar* v. *Vincent,* [454 U.S. 263 (1981)], where we concluded that the state's provision of a forum neutrally "open to a broad class of non-religious as well as religious speakers" does not "confer any imprimatur of State approval," so here: "the provision of benefits to so broad a spectrum of groups is an important index of secular effect."
> In this respect, as well as others, this case is vitally different from the scheme struck down in *Nyquist.* There, public assistance amounting to tuition grants, was provided only to parents of children in *nonpublic* schools. This fact had considerable bearing on our decision striking down the New York statute at issue; we explicitly distinguished both *Allen* and *Everson* on the grounds that "In both cases the class of beneficiaries included *all* schoolchildren, those in public as well as those in private schools." . . . Moreover, we intimated that "public assistance (*e.g.,* scholarships) made available generally without regard to the sectarian–nonsectarian or

public–nonpublic nature of the institution benefited," *ibid.,* might not offend the Establishment Clause. We think the tax deduction [in this case] is more similar to this latter type of program than it is to the arrangement struck down in *Nyquist.* Unlike the assistance at issue in *Nyquist,* [this scheme] permits *all* parents—whether their children attend public school or private—to deduct their children's educational expenses. As *Widmar* and our other decisions indicate, a program . . . that neutrally provides state assistance to a broad spectrum of citizens is not readily subject to challenge under the Establishment Clause.

We also agree with the Court of Appeals that, by channeling whatever assistance it may provide to parochial schools through individual parents, Minnesota has reduced the Establishment Clause objections to which its action is subject. . . . Where, as here, aid to parochial schools is available only as a result of decisions of individual parents no "imprimatur of State approval" . . . can be deemed to have been conferred on any particular religion, or on religion generally.

(Footnotes and citations omitted.) *Mueller,* at 3068–69.

The vocational rehabilitation program in the case at bar is a general financial aid program for handicapped students that is available or potentially available to all handicapped students regardless of their religion, their plans to attend a public or private, sectarian or nonsectarian college, and their secular or religious career goals. It is highly likely that only a very small percentage of the handicapped students benefited by the program would choose to pursue religious career training, and that those that do will provide the institution they attend only indirect and incidental benefits from state funds resulting entirely from the individual student's own personal, uncoerced choice of college, a situation that grants no "imprimatur of state approval" for any particular religious college or career. Furthermore, as discussed below, it is unclear from the record whether the instruction Mr. Witters wishes to receive is sectarian or involves religious indoctrination in any meaningful constitutional sense, although the fact that the instruction occurs at the college level would probably lead the United States Supreme Court

to assume that the instruction was not so tainted. Even if the instruction were sectarian, however, as long as the program grants vocational rehabilitation aid to all handicapped students equally, the fact that a few might choose to spend their money on vocational training with a religious career in mind does not give the program a "principal or primary effect" of advancing religion. The clear trend of recent federal case law discourages such a result, and we should not go beyond the interpretation of the United States Supreme Court in construing the federal constitution.

## II

Appellant also argues that denying him financial assistance that is available to all other handicapped Washingtonians solely because he wishes to pursue a religious career is a violation of the free exercise clause of the federal bill of rights. The majority points out that to show a violation of the federal free exercise clause, one must show "'the coercive effect of the enactment as it operates against him in the practice of his religion'". Majority, at 631 (quoting from *School Dist. v. Schempp,* 374 U.S. 203, 223, 10 L. Ed. 2d 844, 83 S. Ct. 1560 (1963)). Although I do not dispute this statement as an abstract proposition, I disagree with the majority's peremptory conclusion that denying appellant assistance that is available to all other persons similarly situated solely because of his religious career goals does not constitute "coercion." In *McDaniel v. Paty,* 435 U.S. 618, 55 L. Ed. 2d 593, 98 S. Ct. 1322 (1978), for example, the United States Supreme Court held that a state's constitutional prohibition on ordained ministers serving in the state legislature and its limited constitutional convention violated the federal free exercise clause. The Court stated:

the right to the free exercise of religion unquestionably encompasses the right to preach, proselyte, and perform other similar religious functions, or, in other words, to be a minister of the type McDaniel was found to be. Tennessee also acknowledges the right of its adult citizens generally to seek and hold office as legislators or delegates to the state constitutional convention. Yet under

the clergy–disqualification provision, McDaniel cannot exercise both rights simultaneously because the State has conditioned the exercise of one on the surrender of the other. Or, in James Madison's words, the State is "punishing a religious profession with the privation of a civil right." In so doing, Tennessee has encroached upon McDaniel's right to the free exercise of religion. "[T]o condition the availability of benefits [including access to the ballot] upon this appellant's willingness to violate a cardinal principle of [his] religious faith [by surrendering his religiously impelled ministry] effectively penalizes the free exercise of [his] constitutional liberties."

(Citations omitted. Bracketed material in original.) *McDaniel,* at 626. In this case, as in *McDaniel,* appellant is forced to choose between pursuing his religious career and taking advantage of certain benefits or rights that the State provides to all other similarly situated persons. While there are some obvious distinctions between denying a person the right to run for public office and denying him financial assistance because of his religious occupation, I believe that both constitute "coercion" within the meaning of the free exercise clause, since both penalize the choice of a religious career.

Two other United States Supreme Court cases also support this conclusion. In *Sherbert v. Verner,* 374 U.S. 398, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963), the Court held that the federal free exercise clause prohibited a state from denying unemployment compensation benefits to a worker who was fired because her religious beliefs prevented her from performing Saturday work assigned to her by her employer. The Court explained its decision by stating that

"[i]f the purpose or effect of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect." . . . Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the pre-

cepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

(Citation omitted.) *Sherbert,* at 404. The Court added that the constitutional infirmity could not be cured by holding that unemployment compensation is merely a privilege rather than a right, since "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Sherbert,* at 404.

Similarly, in the more recent case of *Thomas v. Review Bd.,* 450 U.S. 707, 67 L. Ed. 2d 624, 101 S. Ct. 1425 (1981), the Court quoted extensively from *Sherbert* in deciding that unemployment compensation could not, consistent with the mandate of the free exercise clause, be denied to a person who quit his job because his religion prohibited him from participating in the production of military weapons. The Court held that

[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

*Thomas,* at 717–18.

Finally, I question how the State's policy in the case at bar can be found consistent with its obligation under the federal free exercise clause to "accommodate" religion. *See Sumner v. First Baptist Church,* 97 Wn.2d 1, 15, 639 P.2d 1358 (1982) (Utter, J., concurring); *Zorach v. Clauson,* 343 U.S. 306, 96 L. Ed. 954, 72 S. Ct. 679 (1952).

The facts of this case are very similar to those in *Sherbert* and *Thomas.* While the State is not obligated to provide handicapped vocational education assistance, once

it decides to do so I believe that the free exercise clause forbids the State from penalizing those who have chosen religious careers by excluding them from a general financial aid program solely for that reason.

## III

The majority holds that "the provision of state aid to a person studying to be a pastor, missionary, or church youth director violates the establishment clause of the first amendment to the United States Constitution." Majority, at 626. The majority goes on to state that "[s]ince our state constitution requires a far stricter separation of church and state than the federal constitution . . ., it is unnecessary to address the constitutionality of the aid under our state constitution." Majority, at 626.

For guidance in future cases before the courts of this state we should comment on the position our state constitution requires us to hold. An in–depth analysis of the historic purpose and meaning of Const. art. 1, § 11 shows that that provision does not prohibit the use of public money for the purposes proposed by Mr. Witters, and that the State's denial of aid to Mr. Witters based on the misperceived mandate of Const. art. 1, § 11 was improper.

## A

When the delegates to the Washington Constitutional Convention met in Olympia on July 4, 1889, their single overriding purpose was to pave the way for Washington's admission into the Union. In order to gain for Washington the long–sought status of a sovereign state, the delegates had to agree on a constitution that was acceptable to Congress, which had spelled out some of its requirements in the Enabling Act that authorized the Convention. In addition, the new constitution would have to be approved by a majority of Washingtonians, many of whom were deeply concerned with the then–current debate over the proper relationship between government and religion.

Section 4 of the Enabling Act commanded that "provision shall be made [in the new constitution] for the estab-

lishment and maintenance of systems of public schools, which shall be open to all the children of [Washington], and free from sectarian control." 25 Stat. 676 (approved Feb. 22, 1889), *reprinted in* Revised Code of Washington, vol. 0 (1983). This provision reflected a widespread concern about the still–common practice of Bible reading and other forms of sectarian religious instruction in the public primary and secondary schools. *See* D. Boles, *The Bible, Religion, and the Public Schools* 35 (1961). Such practices were particularly offensive to the recent waves of Catholic and Jewish immigrants who objected to their children receiving compulsory instruction in the majority Protestant faith. *See* D. Boles, *supra* at 28–30, 32. Similarly, many Protestants objected to giving public subsidies to Catholic parochial schools. *See generally* B. Parkany, *"Religious Instruction" in the Washington Constitution* (1965) (thesis available in the Washington State Library); D. Boles, *supra.*

In the decades before the Washington Constitutional Convention, the Republicans, who dominated the Convention,[3] became the primary advocates of church–state separation. For example, in 1876 and 1880 the Republican party platforms called for a federal constitutional amendment "forbidding the application of any public funds or property for the benefit of any school or institution under sectarian control.'" B. Parkany, pt. 2, at 11.

The Democrats, with their large urban Catholic constituency, were said to favor tax support for parochial schools. B. Parkany, pt. 2, at 7; D. Boles, at 30–31. By 1889, however, due in part to the efforts of the famous educator Horace Mann, this was a minority position. The general consensus in Washington and the rest of the nation was that public schools should not give sectarian religious instruction, and that private parochial schools should not

---

[3]*See* B. Parkany, pt. 1, at 3; *Journal of the Washington State Constitutional Convention, 1889,* at v (B. Rosenow ed. 1962) (noting that Republican delegates outnumbered Democrats 43 to 29, with 3 delegates not pertaining to either party).

be supported by public funds. *See* B. Parkany, pt. 2, at 14; D. Boles, at 23–27, 33. This attitude was reflected in many state constitutions, including Washington's, that were written in the last half of the 19th Century. D. Boles, at 33–34.

That the Convention was concerned with forced religious instruction in public primary and secondary schools and public aid to parochial schools is supported by a number of circumstances surrounding the adoption of the "religious instruction" clause itself. On July 17, 1889, the Seattle Post–Intelligencer and the Tacoma Morning Globe both printed the Bill of Rights Committee's first draft of Const. art. 1, § 11, which at that point contained no mention of "religious instruction." It read, in pertinent part: "'No money or property of the state shall be given or appropriated for the benefit of any sectarian or religious society or institution.'" B. Parkany, pt. 1, at 6.

Two days later, on July 19, the Portland Oregonian, which was one of the most widely read newspapers in Washington Territory, ran an editorial concerning "religious instruction" in public schools. The editorial, which was prompted by a debate in an eastern journal on the same subject, used the phrase "religious instruction" six times, and concluded with a strong stand:

> In order that liberty of conscience may remain inviolate as intended by our constitution builders, there must be an absolute separation of church and state, religion and public schools; and in order to guide the public school system onward to the fulfillment of the mission that called it into existence, it is necessary to keep the public schools free from religious influences, from theological disputes and sectarian teachings. . . .
>
> . . .
> . . . Religious instruction in the public school means a gradual retrogression to the union of church and state, and this union means a tyrannical government and a corrupt priesthood. . . . Religious instruction ought not to be ignored, but the home and church are the places wherein both precept and example will be most effective; but if liberty of conscience is valued at all, keep religion away from public schools.

The Oregonian, July 19, 1889, at 4, col. 2. On the same date, the Spokane Falls Review ran an article on the same subject. The Review article, which also used the phrase "religious instruction," summarized the positions of eminent clergymen on both sides of the debate. Spokane Falls [Daily] Review, July 19, 1889, at 3.

Two days later, the Oregonian printed a lengthy and thoughtful letter responding to the Oregonian's "religious instruction" editorial. The letter stated:

> Whenever the Protestant version of the Bible is read as an act of worship in the public schools, the consciences of Roman Catholics, Jews, agnostics, spiritualists, materialists and those holding several other forms of faith, are violated. Wherever, as in some localities, Catholic sisters or priests appear in the public schools, in their religious garb, and conduct religious worship in conjunction with their work as teachers, the conscientious objections of all denominations except the Catholic are disregarded. Whenever the Lord's prayer is recited, or extempore prayer is made, or religious hymns are sung, the religious views of some portion of the people are trampled upon in an institution sustained by enforced taxation and which should be open to all. To this it is answered by the advocates of these policies that religious instruction of some kind is an essential part of education. And to this, again, the opponents of these policies reply that, whether religious instruction be essential to education or not, it is not a kind of instruction which can be imparted in public schools.

Letter from B. F. Underwood, the Oregonian, July 21, 1889, at 6, cols. 5, 6. Mr. Underwood concluded:

> As the right even of the majority to govern the individual in matters of religion is not now delegated by any American constitution to any legislature, the right stands reserved to each American citizen, and any exercise of it in the least degree by a legislature is a usurpation of tyranny unjust and unrepublican.

On July 25, a few days after the flurry of newspaper editorials, articles and letters to the editor on religious instruction in the public elementary and secondary schools, the Bill of Rights Committee submitted its amended report

to the Convention. The new draft, which was later adopted by the Republican–dominated Convention without debate, read in pertinent part as follows:

> No public money or property shall be appropriated for, or applied to any religious worship, exercise or instruction, or the support of any religious establishment.

*Journal of the Washington State Constitutional Convention, 1889,* at 500 (B. Rosenow ed. 1962) (analytical index by Q. Smith) (hereinafter B. Rosenow ed.). *See also* B. Parkany, pt. 1, at 1.

While I can find no direct evidence that the members of the Bill of Rights Committee borrowed the phrase "religious instruction" from the newspaper pieces that were published between the first and final drafts of its report, the circumstantial evidence is strong. Moreover, even if the nearly simultaneous uses of the phrase "religious instruction" by the delegates and the newspapers were merely coincidental, the frequent use of the phrase in the popular press and the contemporaneous public concern on the subject of religious instruction in the public primary and secondary schools with which the phrase was connected does provide uncontradicted evidence as to the "common and ordinary meaning" of the phrase and what it would have meant to a delegate or voter in 1889. *See generally State ex rel. Albright v. Spokane,* 64 Wn.2d 767, 770, 394 P.2d 231, 233 (1964); *B.F. Sturtevant Co. v. Industrial Comm'n,* 186 Wis. 10, 19, 202 N.W. 324, 327 (1925). It also provides strong evidence about the history and circumstances of the enactment and the evils that the constitutional provision were intended to correct, both of which may be considered in constitutional construction. *See Yelle v. Bishop,* 55 Wn.2d 286, 291, 347 P.2d 1081 (1959); *State ex rel. Evans v. Brotherhood of Friends,* 41 Wn.2d 133, 146, 247 P.2d 787, 795 (1952); *State ex rel. PUD 1 v. Wylie,* 28 Wn.2d 113, 127, 182 P.2d 706, 714 (1947); *Bowen v. Department of Social Sec.,* 14 Wn.2d 148, 150, 127 P.2d 682, 684 (1942); *Sears v. Western Thrift Stores,* 10 Wn.2d 372, 382, 116 P.2d 756, 761 (1941).

Additional and even more convincing evidence about the meaning of the phrase "religious instruction" can be found in the relevant debates on Const. art. 9, § 4, which occurred 4 days after the Convention's final passage of Const. art. 1, § 11. B. Rosenow ed., at 268, 328–29. At that point, Const. art. 9, § 4 read: "All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence." Tacoma Ledger, Aug. 11, 1889, at 4, col. 2. Mr. Comegys, a member of the Bill of Rights Committee, unsuccessfully tried to amend this section on the floor of the Convention by adding the words "'and no religious exercises or instructions shall be permitted therein.'" B. Rosenow ed., at 329; Tacoma Ledger, at 4. Mr. Comegys explained the need for the amendment to his fellow delegates by stating that "sectarians had not been by the courts prohibited from reading Bibles or prayers. That was not toleration to Jews, Catholics, agnostics, Mohammedans and several other creeds and sects who were entitled to it as much as Protestants . . ." Tacoma Ledger, at 4, col. 2.

One early Washington case directly addressed the intent of the framers in drafting Const. art. 1, § 11. In *State ex rel. Dearle v. Frazier,* 102 Wash. 369, 173 P. 35 (1918), this court held unconstitutional a plan to give public high school students credit for studying the Bible outside of school. Although the current validity or applicability of much of that case is questionable in light of *Calvary Bible Presbyterian Church v. Board of Regents,* 72 Wn.2d 912, 436 P.2d 189 (1967), *cert. denied,* 393 U.S. 960 (1968), no subsequent case has challenged the accuracy of the *Dearle* court's statement that

it is a matter within the common knowledge of those who followed the discussion attending the framing of our [state] constitution that it was the purpose of the men of that time to avoid all of the evils of religious controversies, the diversion of school funds to denominational schools and institutions, and the litigation that had occurred in other states. . . . *The question then was— and the people who adopted the constitution were so*

*advised—whether we should adopt a constitution which provided in terms that no religious instruction should ever be a part, directly or indirectly, of the curriculum of our schools.*

(Italics mine.) *Dearle,* at 381. The early Attorney Generals' opinions also demonstrate that Const. art. 1, § 11 was applied primarily in the context of prohibiting certain kinds of devotional sectarian instruction in public primary and secondary schools. *See, e.g.,* AGO, Sept. 19, 1891 (Bible reading, prayers and devotional religious exercises in public schools prohibited by Const. art, 1, § 11); AGO, Dec. 20, 1909 (unconstitutional to open public school day with prayer); AGO, Mar. 24, 1916 (unconstitutional to give public high school credit for optional Bible study).

From all of the above evidence, I conclude that Const. art. 1, § 11, with its use of the phrase "religious instruction," was intended merely to prohibit sectarian religious instruction in the public schools, and to prevent direct public subsidies to parochial schools. There is no indication the framers had the slightest intention of making a secular career goal a constitutional prerequisite for any type of aid to the "poor and infirm." *See generally* Const. art. 8, § 7. No such problem existed at the time our constitution was drafted, and we should not, by judicial interpretation, extend its words to cover situations that the document's text and history indicate were never contemplated by the drafters.

## B

Even if Const. art. 1, § 11 were meant to prohibit educational assistance to handicapped persons seeking "religious" vocational instruction, the record does not support a finding that "religious instruction" is involved here. Appellant Witters was denied funds not because the college of his choice was religiously oriented, but because his vocational objective was to become a pastor, missionary or youth director.

As demonstrated by the sole applicable Washington case,

the only way to determine whether Mr. Witters' proposed instruction is religious within the meaning of Const. art. 1, § 11 is to examine the instruction itself and see whether it is taught in an objective manner or in a devotional manner that resembles worship or indoctrination. *Calvary Bible Presbyterian Church v. Board of Regents*, 72 Wn.2d 912, 919–21, 436 P.2d 189 (1967), *cert. denied*, 393 U.S. 960 (1968). Although the record is notably lacking in evidence regarding the manner of instruction, the parties had stipulated that "[Mr. Witters'] classwork consists of classes instructional in nature for which he pays tuition. There are also devotional chapel services at the school for which he pays nothing." Petitioner's Proposed Factual Stipulation, dated Aug. 11, 1980 (signed by counsel for both parties); see also Appellant's Memorandum of Authorities (before the Hearing Examiner), at 6. The parties also stipulated that the college Mr. Witters wished to attend was not a denominational or sectarian institution, but offered instruction on a nondenominational basis. Verbatim Report of Proceedings, at 6.

Aside from the stipulated facts, the record is totally devoid of any independent evidence as to how the courses were taught. Such courses as Old Testament history and church administration could well be taught in an objective, nondevotional manner, even in a private "religious" college. It is likely that all or most of those attending the college are already believers of various religious doctrines, and attend the college to gain factual and practical knowledge that will help them attain their career objectives and teach others what they believe to be true. If the court wished to determine whether Mr. Witters received devotional instruction in violation of Const. art. 1, § 11, it should remand the case so that the appropriate fact–finding body could determine just how the courses were conducted. *See Calvary Bible Presbyterian Church v. Board of Regents, supra; State ex rel. Gunstone v. State Hwy. Comm'n*, 72 Wn.2d 673, 674–75, 434 P.2d 734 (1967); *Skold v. Johnson*, 29 Wn. App. 541, 630 P.2d 456 (1981); *Franklin Cy. Sher-*

*iff's Office v. Sellers,* 97 Wn.2d 317, 323, 646 P.2d 113 (1982), *cert. denied,* 459 U.S. 1106 (1983).

## C

There was also some contention by the State that providing vocational rehabilitation aid to Mr. Witters would violate article 9, section 4 of the Washington Constitution, and there is language in *Weiss v. Bruno,* 82 Wn.2d 199, 509 P.2d 973 (1973) that would support such a proposition. The arguments before this court in this case have not provided us at this time with an adequate basis for declining to follow that case. My conclusion that the free exercise clause prohibits denial of vocational rehabilitation aid to Mr. Witters would make any possible bar established by Const. art. 9, § 4 and *Weiss* irrelevant, however, since under the supremacy clause state constitutions must yield to directly contrary provisions of the federal constitution. The question of the continuing vitality of *Weiss* may therefore be reserved until a more appropriate case arises.

## IV

I would hold that the granting of vocational educational assistance to Mr. Witters would not violate Const. art. 1, § 11; that any bar to such aid presented by Const. art. 9, § 4 as interpreted in *Weiss* is overcome by appellant's federal constitutional right to freely exercise his religious rights; and that the federal establishment clause does not bar the type of aid sought here. Such a result would be consistent with both the historic meaning of our state constitution and the American tradition of religious liberty as embodied in the free exercise clause of the First Amendment and as reflected in the current trend of cases emanating from the United States Supreme Court.

DOLLIVER, J., concurs with UTTER, J.